No. 24-13660

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

CAREY DALE GRAYSON,
*Plaintiff-Appellant*,

v.

JOHN Q. HAMM,
Commissioner of the Alabama Department of Corrections,
*Defendant-Appellee*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:24-cv-00376-RAH-KFP

## RESPONSE BRIEF OF DEFENDANT-APPELLEE

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr.
  *Solicitor General*

Robert M. Overing
  *Deputy Solicitor General*

Dylan Mauldin
  *Ass't Solicitor General*

Beth Jackson Hughes
Polly S. Kenny
Henry M. Johnson
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Robert.Overing@AlabamaAG.gov

*Counsel for Appellee*

November 13, 2024

*Grayson v. Hamm*, No. 24-13660-P

## CERTIFICATE OF INTERESTED PERSONS

In accordance with 11th Cir. R. 26.1-1(a)(3) and 26.1-2(c), undersigned counsel certifies that the certificate of interested persons filed by Appellee on November 13, 2024, is complete.

No publicly traded companies are parties to this case.

<u>***s/ Robert M. Overing***</u>
Robert M. Overing
*Deputy Solicitor General*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant's opening brief raises two arguments, and oral argument is not necessary to resolve them. The first centers on one sentence of *dicta* in *Baze v. Rees*, 553 U.S. 35 (2008), to imply a *per se* rule that no court has ever endorsed. The second alleges an unconstitutional risk of severe pain yet fails to identify clear error in the district court's factual findings; fails to rehabilitate the plaintiff's expert witness, who was deemed less credible and less persuasive than the State's expert; and fails generally to deal with the State's evidence on which the district court relied.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. C1

Statement Regarding Oral Argument ........................................................... i

Table of Authorities .................................................................................. iv

Introduction .............................................................................................. 1

Statement ................................................................................................... 3

    I.    Grayson's Crime and Initial Post-Conviction Litigation ........................... 3

        A.    Grayson Murders, Molests, and Mutilates Vicki Deblieux, For Which He Receives a Unanimous Death Sentence ............................ 3

        B.    Grayson Challenges Lethal Injection and Pleads Nitrogen Hypoxia as an Alternative Method of Execution .............................. 4

    II.    The Executions of Kenneth Smith & Alan Miller By Nitrogen Hypoxia ............................................................................................... 5

    III.    Grayson Challenges Nitrogen Hypoxia, The Method He "Came Up With." ................................................................................................ 10

Summary of Argument ............................................................................. 16

Standard of Review ................................................................................. 18

Argument ................................................................................................. 19

    I.    Grayson's Eighth Amendment Claim Has Zero Chance of Success ....... 19

        A.    Grayson's "Conscious Suffocation" Argument is Wrong ................ 20

        B.    The Chance of a Painless Laryngospasm Does Not Present a Substantial Risk of Severe Pain ..................................................... 24

1. Grayson has not shown high odds of a laryngospasm caused by panic or gas resulting in NPPE and mental distress ........................................................................27

2. Grayson has not shown that the alleged risk is severe ...............30

3. The executions of Kenneth Smith and Alan Miller were not cruel, and neither man experienced a laryngospasm.................................................................................32

C. Grayson Failed to Show a Feasible and Readily Available Alternative That Would Significantly Reduce the Alleged Risks.................................................................................................37

1. Grayson's alternative nitrogen protocol fails the feasibility and risk-reduction requirements.................................39

2. Grayson's fentanyl proposal should be barred, and it fails the risk-reduction and feasibility requirements..................45

3. Late-breaking and experimental methods fail as a matter of law...........................................................................47

D. Grayson's Claim Will Fail Because He Conceded That Nitrogen Hypoxia Is More Humane Than Lawful Alternatives and Not Designed to Superadd Pain.................................................49

II. Grayson Has Not Requested Equitable Relief, But If He Does, the Equities Favor the State...........................................................................50

Conclusion ............................................................................................52

Certificate of Compliance ......................................................................54

Certificate of Service .............................................................................55

# TABLE OF AUTHORITIES

## Cases

*Barber v. Gov. of Ala.*,
 73 F.4th 1306 (11th Cir. 2023) ..............................................................19

*Barr v. Lee*,
 591 U.S. 979 (2020)............................................................... 19, 26, 31

*Baze v. Rees*,
 553 U.S. 35 (2008)................................................... i, 9, 20, 21, 23,24,
 25, 30, 35, 37, 40, 47, 48

*BellSouth Telecomms. v. MCI Metro Access Trans. Servs.*,
 425 F.3d 964 (11th Cir. 2005) .............................................................18

*Brant v. Sec'y, Dep't of Corr.*,
 2024 WL 1187330 (11th Cir. Feb. 29, 2024) ....................................21

*Brooks v. Warden*,
 810 F.3d 812 (11th Cir. 2016) .............................................................39

*Bucklew v. Precythe*,
 587 U.S. 119 (2019)...................................... 15, 20, 21, 23, 25, 26, 31
 37, 40, 42, 46, 47, 50-52

*Calderon v. Thompson*,
 523 U.S. 538 (1998)...............................................................................51

*Chavez v. Fla. SP Warden*,
 742 F.3d 1267 (11th Cir. 2014) .........................................................18

*Cumulus Media v. Clear Channel Commc'ns*,
 304 F.3d 1167 (11th Cir. 2002) .........................................................18

*FTC v. On Point Cap. Partners*,
 17 F.4th 1066 (11th Cir. 2021) ..........................................................18

*Glossip v. Gross*,
 576 U.S. 836 (2015)....................................... 19, 21, 37, 40, 47, 49, 50

*Gomez v. U.S. Dist. Court for N. Dist. of Cal.*,
 503 U.S. 653 (1992).............................................................................52

*Grants Pass v. Johnson*,
    603 U.S. ____ (2024) ...........................................................................49

*Grayson v. State*,
    824 So. 2d 804 (Ala. Crim. App. 1999) .........................................3, 4

*In re Ala. Lethal Injection Protocol Litig.*,
    No. 2:12-cv-316-WKW-CSC (M.D. Ala. filed Nov. 29, 2017) ....................4, 47

*In re Kemmler*,
    136 U.S. 436 (1890) ...........................................................................23

*In re Ohio Execution Protocol Litig.*,
    881 F.3d 447 (6th Cir. 2018) .............................................................26

*In re Ohio Execution Protocol Litig.*,
    946 F.3d 287 (6th Cir. 2019) .............................................................23

*Jordan v. Comm'r, Miss. Dep't of Corr.*,
    947 F.3d 1322 (11th Cir. 2020) .........................................................40

*Louisiana ex rel. Francis v. Resweber*,
    329 U.S. 459 (1947) ...........................................................................25

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ...........................................................................18

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) .........................................................28

*Middlebrooks v. Parker*,
    22 F.4th 621 (6th Cir. 2022) ....................................................... 24, 47

*Miller v. Marshall*,
    No. 2:24-cv-197-RAH (M.D. Ala. filed Mar. 9, 2024) .......................9

*Mills v. Hamm*,
    102 F.4th 1245 (11th Cir. 2024) .......................................................51

*Nance v. Ward*,
    597 U.S. 159 (2022) ....................................................... 19, 37, 47, 48

*Nelson v. Campbell*,
    541 U.S. 637 (2004) ...........................................................................52

*New Hampshire v. Maine*,
    532 U.S. 742 (2001).........................................................................24

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................18

*Ramirez v. Collier*,
    595 U.S. 411 (2022).........................................................................52

*Smith v. Comm'r*,
    No. 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024) ................6

*Smith v. Hamm*,
    144 S. Ct. 414 (2024) .............................................................. 6, 19, 20

*Smith v. Hamm*,
    No. 2:23-CV-656-RAH, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024)............5, 6

*Smith v. Hamm*,
    No. 24-10095 (11th Cir. filed Jan. 17, 2024) ......................................6

*Thompson v. Wainwright*,
    714 F.2d 1495 (11th Cir. 1983) ........................................................51

*Wilkerson v. Utah*,
    99 U.S. 130 (1879)...........................................................................23

*Winter v. NRDC*,
    555 U.S. 7 (2008)..............................................................................18

*Woods v. Comm'r*,
    951 F.3d 1288 (11th Cir. 2020) ........................................................52

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) ........................................................51

**Statutes**

Ala. Code §15-18-82(c) ...........................................................................41

**Other Authorities**

Nicholas Bogel-Burroughs,
*A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw*,
N.Y. Times (Feb. 1, 2024), www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html...............................................................8

Philip Nitschke, *The Facts about Nitrogen Hypoxia 101*,
The Peaceful Pill Handbook (Jan. 27, 2024),
www.peacefulpillhandbook.com/the-facts-about-nitrogen-hypoxia-101/ ...........8

Stuart Banner,
The Death Penalty: An American History 170 (2002)......................................23

**INTRODUCTION**

Alabama's nitrogen hypoxia protocol works in theory and in practice. The method has been repeatedly challenged, and it has repeatedly withstood scrutiny because breathing pure nitrogen gas is a swift, certain, and humane way to die.

In the proceedings below, Grayson relied primarily on news reporting about the Kenneth Smith execution, the first judicial execution by nitrogen hypoxia. No journalist actually testified at the hearing. Their unsworn and unexamined accounts had "highly questionable value" to start, and by the end of the proceeding, they were heavily undercut by the State's evidence. DE95:46. For instance, while Grayson alleges that Kenneth Smith and Alan Miller painfully suffocated over a long period of time, "evidence at the hearing showed that [they] became unconscious within minutes." DE95:48. While Grayson describes Smith as writhing in agony, the evidence showed "that Smith held his breath and struggled against the restraints" voluntarily. *Id.* While Grayson characterized the condemned men as gasping for air, the evidence showed "agonal breathing after their loss of consciousness." *Id.* On these key points, Grayson's opening brief does not specifically identify *any* clear errors in the district court's factual findings nor overcome the State's evidence.

On appeal, Grayson has little to work with because he offered "no case studies or articles," DE95:46, and his expert "identifie[d] no peer-reviewed study or any other basis to support his opinion," DE95:40; *accord* DE95:37. The "battle of the

experts" was over before it began. DE:95:51. As "Dr. Antognini pointed out," "Dr. McAlary's opinion … was unsupported by evidence and case studies." DE95:12. In contrast, the State brought "not only medical testimony …, but also numerous third-party articles and case studies … supportive of Dr. Antognini's opinions." DE95:45-46; *id.* at 51 (Grayson's expert "has no supporting case studies or other supporting medical testimony while the [State's expert] (Dr. Antognini) does."). In addition, much of Dr. McAlary's testimony agreed with the State, including the crucial admission that the nitrogen hypoxia protocol would not cause an inmate to suffer pain—only, at most, "panic and anxiety." *E.g.*, DE95:10.

Grayson's expert was so thoroughly discredited that it's no surprise his brief on appeal mentions Dr. McAlary just once—three pages before its conclusion. But with or without his expert, Grayson's "evidence and allegations amount to speculation, a speculative parade of highly unlikely events." DE95:44. The only concrete theory on offer was the idea that Grayson would suffer a painless spasm, a temporary constriction of the vocal cords. The record is even less supportive of Grayson's alternative methods, which would be experimental and pose their own risks. DE95:50-51. Grayson failed to carry his burden to show a clear likelihood of success, and the judgment should be affirmed.

**STATEMENT**

**I.    Grayson's Crime and Initial Post-Conviction Litigation.**

**A.    Grayson Murders, Molests, and Mutilates Vicki Deblieux, For Which He Receives a Unanimous Death Sentence.**

On February 21, 1994, Carey Grayson and three friends picked up a hitchhiker, Vicki Deblieux, who was on her way to her mother's home. *Grayson v. State*, 824 So. 2d 804, 809 (Ala. Crim. App. 1999). They took her to a wooded area and began to drink, but Vicki knew something was wrong and tried to run. Grayson and his friends kicked and beat her nearly to death and stood on her throat until she gurgled blood. Her last gasping words were, "Okay, I'll party." *Id.* The killers removed her clothing, played with her body, and threw her off a cliff. Later, they returned to the scene "where they began to mutilate the body by stabbing and cutting her 180 times, removing part of a lung, and removing her fingers and thumbs." *Id.* Every bone in her face and almost every bone in her skull was fractured; the medical examiner determined that she was alive during much of the beating. *Id.* Grayson's precise motive for such senseless violence remains a mystery, but law enforcement did find satanic drawings and writings among Grayson's possessions. *Id.* at 818-19.

Trial began in January 1996. Grayson was ultimately convicted of capital murder and sentenced to death by a vote of 12 to 0. *Id.* at 808. The trial court found two aggravating circumstances—one that the capital offense was committed while Grayson was engaged in kidnapping and two that the offense was especially heinous,

3

atrocious, or cruel. *Id.* at 842. To the Alabama Court of Criminal Appeals, it was "abundantly clear that [the murder] was unnecessarily torturous, pitiless, conscienceless, extremely wicked, and shockingly evil." *Id.*

### B. Grayson Challenges Lethal Injection and Pleads Nitrogen Hypoxia as an Alternative Method of Execution.

Grayson exhausted appellate and collateral review in 2011, and the State moved for his execution by lethal injection. But the Alabama Supreme Court (ASC) ultimately stayed Grayson's execution pending resolution of a §1983 lawsuit filed in the U.S. District Court for the Middle District of Alabama. Grayson's federal challenge to lethal injection was consolidated with those of other inmates, and litigation continued for several years.

"In that litigation, Grayson claimed that nitrogen gas introduced through a mask (i.e., nitrogen hypoxia) was a more humane and constitutional method of execution than the ADOC's then-existing lethal injection protocol." DE95:3 (citing ECF No. 348 at 32-33, *In re Ala. Lethal Injection Protocol Litig.*, No. 2:12-cv-316-WKW-CSC (M.D. Ala. filed Nov. 29, 2017)). Indeed, in Grayson's deposition in this case, he called himself "the poster child" for nitrogen gas because he "came up with it." DE84-53:48. With respect to pleading nitrogen hypoxia as an alternative to lethal injection, Grayson admitted:

> We had a plan. Our plan was to cost [the State] as much money, make it … as expensive as it can be done, and as shockingly as it could be done. So I went looking for shocking. And I found nitrous gas. John

[Palombi, his attorney,] went looking for something. And that's what we came up with. ***It was a stalling tactic.*** But if it didn't stall well enough I didn't suffer at the end. They got me.

*Id.* at 75-76 (emphasis added). While litigation was ongoing, the Alabama Legislature made nitrogen hypoxia one of the statutory methods of execution. Grayson elected nitrogen hypoxia and moved to dismiss his federal lawsuit as moot. By agreeing not to execute Grayson by lethal injection and adopting nitrogen hypoxia, the State provided the relief Grayson sought. Accordingly, the State has maintained that Grayson should be estopped from pursuing Eighth Amendment claims inconsistent with his prior representation that nitrogen hypoxia is a generally constitutional method of execution. *See infra* §§I.A, I.C, II.

## II.    The Executions of Kenneth Smith & Alan Miller By Nitrogen Hypoxia.

Kenneth Smith and Alan Miller also elected nitrogen hypoxia, and the State executed them using the method earlier this year.

**A. Kenneth Smith.** Smith challenged nitrogen hypoxia, the method he elected, on two primary grounds. *First*, Smith and multiple experts asserted that because of Smith's PTSD, he would vomit in the mask during the execution and then choke to death on his own vomit before dying of nitrogen hypoxia. *See, e.g.*, *Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 262867, at *1 (M.D. Ala. Jan. 24, 2024). Among the key facts undercutting Smith's claim was the total absence of any history of vomiting—despite Smith experiencing PTSD for over a year. State's Br.

at 10-11, *Smith v. Hamm*, No. 24-10095 (11th Cir. filed Jan. 17, 2024).[1] The district court rejected Smith's "theoretical" concern, which relied "upon the occurrence of a cascade of unlikely events." *Id.* at 2. The risk was "speculative" then, *id.*, and the alleged "certainty never happened," DE95:44 n.20.

*Second*, Smith and his expert Dr. Philip Nitschke asserted that ADOC's mask would not produce a tight seal. But the district court heard copious testimony on the mask and physically "examined [it] in detail." *Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 116303, at *4 n.3 (M.D. Ala. Jan. 10, 2024). The mask is one "often used in industrial settings" where "air conditions are or can be dangerous." *Id.* Given "the harness system, the contours and size of the face shield, and the rubber seal," the district court found "it highly unlikely that the mask would dislodge or that the seal would be broken." *Id.* at *20. The mask's "design and fit" enable it to be "tightly secured on the condemned inmate's head in a positive pressure environment." *Id.* The court found Smith's fears to be "highly unlikely," *id.*, and this Court agreed, *Smith v. Comm'r*, No. 24-10095, 2024 WL 266027, at *8 (11th Cir. Jan. 24, 2024), *cert. denied*, 144 S. Ct. 414 (2024) ("Even if the mask is an imperfect fit, the footage

---

[1] An hour into oral argument before this Court, Smith's attorney disclosed in rebuttal that Smith had been vomiting for quite some time. Smith, of course, was not permitted to supplement the record with evidence on appeal, nor could he supplement the record in the district court while his appeal was pending. But this Court remanded the case for the limited purpose of entertaining Smith's motion to supplement the record. The district court heard the new evidence and still denied preliminary injunctive relief. *Smith*, 2024 WL 262867 at *2.

exhibits an unsecured mask that, when pumped with a high volume of nitrogen, creates a rapidly hypoxic environment over the course of 45 seconds."). Today, there is no evidence—despite Smith's movements on the gurney—that the mask became dislodged or that excess oxygen entrained into the mask.

Neither hypothetical pressed by Smith and his experts came to pass. As Grayson admits, nitrogen hypoxia causes one to "lose consciousness within seconds, and experience no pain or discomfort while dying of asphyxiation within just a few minutes." DE1 ¶101.[2] And the evidence presented below showed that is exactly what happened to Kenneth Smith after he breathed in nitrogen gas.

What the journalists who described Smith *writhing* did not know was that when Smith was first moving on the gurney, he had not breathed in any nitrogen gas. That suggests his movements were voluntary or associated with holding his breath. We know that Smith did hold his breath because his blood-oxygen levels remained constant and high (98-99%) for some time, and then after he exhaled and ceased fighting, they suddenly plummeted. DE95:9 (describing testimony). Grayson has never been able to explain this evidence. In contrast, the State's view was corroborated by testimony from (1) the ADOC Commissioner, (2) the Warden of Holman Correctional Facility, (3) the ADOC Regional Director, and (4) the

---

[2] Grayson later amended his complaint to remove Paragraph 101 but argued that it still reflected his position on what should happen "assuming proper administration" of a nitrogen hypoxia method of execution. DE39:5.

execution team captain, all of whom personally observed Smith holding his breath and fighting against the restraints voluntarily or had strong reason to believe that he did. Another eyewitness thought Smith had "tried to hold his breath," according to the New York Times.[3] Days later, Smith's own expert Dr. Phillip Nitschke concurred with the State's assessment.[4] No plausible alternative explanation for Smith's movements has been offered here or in Miller's case. And it is difficult to see how nitrogen hypoxia could cause severe pain, given the evidence that inert-gas asphyxiation can kill without warning and its use and favor by right-to-die activists as a peaceful means of suicide. *See, e.g.*, DE58-1-4; DE84-42 & 43.

In addition to unrebutted evidence that Smith moved voluntarily before breathing nitrogen, the State showed that death by hypoxia can involve purposeless movements, convulsions, and agonal breathing after unconsciousness. *See, e.g.*, 2 Tr. 53, 74 (Dr. Antognini). As the Supreme Court has recognized, an inmate's "convulsions or seizures could be misperceived as signs of consciousness or

---

[3] Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw*, N.Y. Times (Feb. 1, 2024), www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

[4] Within days of the execution, Dr. Nitschke explained that some media reports were "outright wrong." *The Facts about Nitrogen Hypoxia 101*, The Peaceful Pill Handbook (Jan. 27, 2024), www.peacefulpillhandbook.com/the-facts-about-nitrogen-hypoxia-101/. Nitrogen hypoxia can be "peaceful and reliable," but Smith was "fighting against his execution in every way possible." *Id.* Because he was "holding his breath," the dying process was "slower." Had Smith "taken deep breaths … he would, almost certainly, have lost consciousness and died much sooner." *Id.*

distress." *Baze*, 553 U.S. at 57; *accord* Blue Br. 10-11 (agreeing that "a lay person without medical training" may well confuse "agonal breathing [for] consciously gasping for air"). That's just what happened in the reports relied upon by Grayson.

**B. Alan Miller.** The State sought Miller's execution warrant on February 21, 2024. He too challenged the method despite having elected it. Among other things, Miller argued that "a trained medical professional" should place and hold the mask, supervise the nitrogen flow rate, and respond if anything "goes awry." ECF No. 1 ¶193, *Miller v. Marshall*, No. 2:24-cv-197-RAH (M.D. Ala. filed Mar. 9, 2024). Miller alleged that the mask would not fit his large face, that ADOC should use "medical grade nitrogen," and that a "tranquilizing medication in pill form" would "reduce thrashing." *Id.* In an order dismissing two of the counts, the district court found Miller's Eighth Amendment allegations to be "noticeably lean on factual detail" and "barely … plausible," but permitted the suit to proceed. *Miller v. Marshall*, 2024 WL 2946093, at *7 (M.D. Ala. June 11, 2024).

Miller sought preliminary injunctive relief and received discovery. He had a team from two major law firms and an expert who ran the Hypoxia Research Laboratory at U.C. San Francisco. Miller received access to ADOC personnel and documents and deposed nearly ten witnesses. After all that, he settled with the State and dismissed his lawsuit. His fears never came to pass. And though his expert claimed that Smith's execution would be the best predictor, "for as much as Smith's

execution was painted in the violent manner that it was, Miller's execution was not." DE95:47. Here, the "evidence established that [Miller's] execution was quick, unconsciousness reached in less than 2 minutes, was void of struggles against the restraints, and with minimal body movement" compared to Smith. *Id.* The State was not "proven wrong" about the efficacy of nitrogen hypoxia. Blue Br. 9.

### III. Grayson Challenges Nitrogen Hypoxia, The Method He "Came Up With."

On June 10, 2024, the State filed a motion in the Alabama Supreme Court for an order authorizing the execution of Carey Grayson. In response, Grayson argued that the Court should not authorize his execution because the State's method would cause "conscious suffocation." He explained that the ASC bore "primary responsibility" for protecting his constitutional rights. In reply, the State argued that Grayson's concerns were unfounded in light of the testimony of witnesses to Smith's execution, Smith's pulse oximetry, and other evidence regarding inert-gas deaths.

The ASC ultimately authorized Grayson's execution by nitrogen hypoxia. Because Grayson's constitutional challenge had already been raised and litigated before the ASC, the State argued that Grayson should be precluded from raising the same claim in federal court under the *Rooker-Feldman* doctrine, claim preclusion, and/or issue preclusion. The district court disagreed. DE95:20-22.

**A.** Grayson filed his original § 1983 complaint challenging ADOC's nitrogen hypoxia protocol in late June. *See* DE1. In that complaint, he alleged that with

"proper administration," nitrogen hypoxia would cause him to "lose consciousness within seconds" and die within "minutes" without any "pain or discomfort." *Id.* ¶101. But ADOC's protocol would result in "unconstitutional pain," he claimed, because (1) the inmate would not be rendered unconscious prior to the administration of nitrogen gas, allegedly causing "mental and physical anguish," *id.* ¶¶105, 111; (2) excess oxygen might enter the mask and prolong the execution, *id.* ¶119; (3) ADOC does not examine the inmates for medical issues like sleep apnea which could prolong the execution, *id.* ¶125; and (4) the execution team is unqualified to monitor the pulse oximeters and EKGs used during the execution, *id.* ¶¶128, 129.

For his alternatives, Grayson first pleaded a nitrogen-hypoxia method that involved injecting the inmate with 10 mg of ketamine, placing him on a table, and "wheel[ing]" him into a hyperbaric chamber filled with 90% nitrogen gas. *See id.* ¶¶78-88. His second alternative was an intramuscular injection of ketamine followed by an intramuscular injection of a lethal dose of fentanyl. *See id.* ¶¶89-96.

Two months after filing his complaint (and after the State's motion to dismiss was fully briefed), Grayson amended his complaint. *See* DE42. He pleaded the same four risks from his original complaint: conscious suffocation; excess oxygen; no pre-execution medical examination; and unqualified personnel monitoring equipment. *See, e.g., id.* ¶¶106, 120, 126, 130.  But he also alleged that Kenneth Smith suffered from negative pressure pulmonary edema (NPPE), *id.* ¶43, and that administering

11

nitrogen hypoxia to a conscious inmate "results in NPPE," *id.* ¶109. And Grayson completely changed his first alternative, removing the hyperbaric chamber. Instead, he offered a nitrogen hypoxia alternative that would supply nitrogen gas at 5 liters per minute. *Id.* ¶89. Before administering nitrogen, ADOC would sedate the inmate using a 10mg/kg oral dose of midazolam (or via intramuscular injection for a noncompliant inmate) and a 4mg/kg intramuscular injection of ketamine. *Id.* ¶¶84, 86 & n.19. If the inmate remains conscious ten minutes later, a second 4mg/kg ketamine injection would be provided. *Id.* ¶¶ 87-88. If he remains conscious after ten more minutes, the execution would be called off. *Id.* ¶ 88.

Grayson moved for a preliminary injunction and received some expedited discovery. DE30. Grayson did not depose any witness. He moved to disqualify the Attorney General's Office from representing defendants. DE38. He moved to videotape Alan Miller's execution. DE50. He moved to amend his complaint again, altering the dosage of midazolam from 10mg/kg to 0.2mg/kg. DE76.

The district court held a comprehensive, two-day hearing on Smith's motion for a preliminary injunction. The court received over 50 exhibits, including numerous case reports and articles on inert gas asphyxiation and media reports describing the Smith and Miller executions. DE95:6-7. The court heard live testimony from ten witnesses, including each side's expert, the medical examiner

who conducted Smith's autopsy, and multiple State employees who witnessed the Smith and/or Miller executions. *Id.* at 7-9.

**B**. On November 6, the district court ruled on the State's motion to dismiss and Grayson's motion for a preliminary injunction. *See* DE69.

As to the State's motion, the court granted it in part and denied it in part. The court granted the motion to dismiss Governor Kay Ivey and Attorney General Steve Marshall as defendants for lack of standing. *Id.* at 19-20. For the remaining defendants (who did not contest standing), the court denied the motion to dismiss.

Turning to Grayson's motion, the court concluded that Grayson failed to establish a substantial likelihood of success on his Eighth Amendment claim. *Id.* at 52. In reaching that conclusion, the district court applied the Supreme Court's well-established method-of-execution framework. *See id.* at 18-20, 35.

First, Grayson failed to show "a risk that is sure or very likely to cause serious illness and needless suffering." *Id.* at 52. For the psychological risk, Grayson relied on Dr. McAlary. *See, e.g.*, *id.* at 45-46. But Dr. McAlary's opinion about that risk was unsupported by any studies or literature. *Id.* at 46. Indeed, Dr. McAlary's "evidence" of psychological harm associated with the protocol was his finding that Kenneth Smith suffered from NPPE. *Id.* at 45. But that finding was "extrapolate[d]" from the autopsy report, *id.* at 45-46, which did not "support" his NPPE theory, *id.* at 51, and was driven by "highly questionable" "hearsay eyewitnesses accounts," *id.*

13

at 45-46. The eyewitness accounts were "conflicting and inconsistent … and in some respects wrong." *Id.* at 47. Dr. Antognini, on the other hand, strongly disagreed with the finding of NPPE—the basis of Dr. McAlary's opinion that Smith suffered psychological harm—and the State offered "numerous third-party articles and cases studies" that "support[ed]" his opinion. *Id.* at 45-46. Thus, the district court found that Dr. Antognini was "more credible and persuasive" than Dr. McAlary. *Id.* at 51.

For Grayson's risks associated with excess oxygen, a pre-execution medical examination, and the execution team's qualifications to monitor equipment, the court found these concerns unsupported by the record and speculative. *See id.* at 47-49.

With "the credibility and weight" of the evidence in view, Grayson was "well short of showing … an unacceptable risk of pain, let alone superadded pain." *Id.* at 44. He instead offered "a speculative parade of highly unlikely events." *Id.*

Second, Grayson had not established "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the Defendants have refused to adopt without a legitimate penological reason." *Id.* at 52. On the alternatives, Grayson "focus[ed]" on his nitrogen hypoxia alternative and provided "very little evidence" about his ketamine-fentanyl alternative. *Id.* at 50 n.27. For both alternatives, the court had "real concerns" about whether those methods were "feasible and readily implement[able]." *Id.* at 49. Grayson lacked evidence to show where ADOC would

14

obtain the drugs and who would administer the drugs. *Id.* It would be difficult to force an inmate to "orally ingest anything, let alone a sedative" as part of the execution. *Id.* And his alternatives were "neither tested nor used." *Id.* at 50.

The district court also found that Grayson's alternatives create "their own issues." *Id.* at 50. Midazolam's side effects include "respiratory depression, agitation, hyperactivity, and combativeness." *Id.* Ketamine can cause "respiratory depression, nausea, vomiting, and anaphylaxis." *Id.* Fentanyl may result in "respiratory depression, muscle rigidity, nausea, vomiting, laryngospasm, and anaphylaxis." *Id.* The district court was troubled by those side effects, especially for "midazolam and ketamine in the context of a nitrogen hypoxia execution," yet Grayson provided "no real analysis or consideration" of any of the risks. *Id.*

Citing *Bucklew*'s holding that States have a legitimate penological reason not to adopt methods that have "never been used to carry out an execution and had no track record of successful use," the court also found that Grayson failed to show the State lacked a legitimate reason to reject his alternatives. *Id.* at 51. Grayson made no effort to demonstrate that his alternatives have a successful "track record," or have even "been used," or "adopted" by another State. *Id.*

Because the district court found no likelihood of success, it denied Grayson's motion without considering the remaining preliminary injunction factors. *Id.* at 52.

## SUMMARY OF ARGUMENT

Grayson has no likelihood of success on the merits and the equities strongly weigh against granting a preliminary injunction.

**I.** On the merits, Grayson needed to make a clear showing that executing him under the protocol is sure or very likely to result in severe pain, and that the State can substantially reduce that pain relatively easily and reasonably quickly by adopting an alternative with a track record of successful use.

**I.A.** Below, Grayson's evidentiary efforts were centered on Dr. McAlary; on appeal, Grayson boldly asserts that the Supreme Court has already held that depriving someone of oxygen results in severe pain, no evidence needed. He points to *dicta*, not a holding, in a case dealing with a method that was alleged to permit an inmate to remain conscious while his lungs were paralyzed. He has no evidence that nitrogen hypoxia is remotely comparable.

**I.B.** What little evidence Grayson has is all about a *psychological* harm. An upper airway constriction may sound painful, but according to his expert, the only relevant effect felt by the inmate would be panic and anxiety. But panic and anxiety may well occur in any judicial execution. Nor are they sure or very likely to occur in the manner Grayson describes. As the district court found, Dr. McAlary's opinion was "unsupported." The district court credited the State's expert, Dr. Antognini, who strongly disagreed with Dr. McAlary's highly speculative theory.

16

**I.C.** Grayson has not provided evidence of known and available alternatives that the State has rejected without legitimate penological reasons. He has offered little assurance that the State could move forward with his execution under one of his alternatives relatively easily and reasonably quickly. His evidence is severely lacking on key questions like from where the State will obtain the drugs for his execution, who will administer the drugs, and how well the drugs will work. Nor has he shown that his alternatives sufficiently reduce risks, for the controlled substances he proposes have risks of their own and can even cause the mental pain he fears. Grayson offers no examples of other States using his methods, nor any studies of their efficacy. Once again, all he offers is the unsupported opinion of Dr. McAlary. As the Supreme Court has recognized, the Eighth Amendment does not require States to experiment with new methods, especially not on the whim of one expert.

**I.D.** Separately, Grayson has admitted that nitrogen hypoxia is not unconstitutionally cruel because he conceded that it is more humane than alternatives the State could have chosen (such as electrocution and lethal injection) and that it was not deliberately designed to inflict pain. Just the opposite.

**II.** Grayson has not asked for equitable relief, but if the Court reaches such factors, they heavily favor the State because of the public's interest in punishing capital murder, Grayson's delay, and Grayson's unclean hands.

17

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Grayson "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 435 (2009). To succeed, Grayson must have made a "clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), that he has satisfied "all of these elements: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest," *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014).

"The district court's decision will not be reversed unless there is a clear abuse of discretion." *BellSouth Telecomms. v. MCI Metro Access Trans. Servs.*, 425 F.3d 964, 968 (11th Cir. 2005). This Court reviews the district court's "legal conclusions *de novo* and its findings of fact for clear error." *FTC v. On Point Cap. Partners*, 17 F.4th 1066, 1078 (11th Cir. 2021). The deferential standard for fact findings recognizes the trial court's "far better position … to evaluate th[e] evidence, and [this Court] will not disturb its factual findings unless they are clearly erroneous." *Cumulus Media v. Clear Channel Commc'ns*, 304 F.3d 1167, 1171 (11th Cir. 2002).

## ARGUMENT

## I.    Grayson's Eighth Amendment Claim Has Zero Chance of Success.

To prove that nitrogen hypoxia is an unconstitutionally cruel method of execution, Grayson must meet an "extremely demanding standard." *Smith v. Hamm*, 144 S. Ct. 414, 416 (2024) (Kagan, J., dissenting). It is an "exceedingly high bar" that no method-of-execution claim has ever surpassed in front of the Supreme Court. *Barr v. Lee*, 591 U.S. 979, 980 (2020). "For good reason—'[f]ar from seeking to superadd terror, pain, or disgrace to their executions, the States have often sought more nearly the opposite,' developing new methods, such as lethal injection, thought to be less painful and more humane than traditional methods, like hanging, that have been uniformly regarded as constitutional for centuries." *Id.* (citation omitted); *accord Barber v. Gov. of Ala.*, 73 F.4th 1306 (11th Cir. 2023).

First, Grayson must show that nitrogen hypoxia poses a "substantial risk" of "severe pain over and above death itself." *Nance v. Ward*, 597 U.S. 159, 164 (2022). That severe pain must be "sure or very likely" to occur. *Glossip v. Gross*, 576 U.S. 836, 877 (2015). Second, Grayson must prove "an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Id.* at 877. That alternative must provide "the State a pathway forward," such as "a veritable blueprint for carrying the death sentence out." *Nance*, 597 U.S. at 169. Grayson must show "that the State has refused to adopt [an alternative] without

19

a legitimate penological reason"—*i.e.*, the State has cruelly "chosen" to "superadd[] pain to the death sentence." *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019).

## A.    Grayson's "Conscious Suffocation" Argument is Wrong.

In the proceedings below, Grayson focused on the alleged risks of an inmate experiencing an upper airway constriction (a laryngospasm) during the execution. The district court rightly rejected that theory as highly speculative and unsupported.

Now, Grayson hopes to persuade this Court that the strength of his evidence does not matter because the existence of pain does not matter: ADOC's protocol violates the Eighth Amendment "per se" because Grayson will be deprived of "breathing air" while he is "conscious." Blue Br. 7, 16. According to Grayson (at 12), the Supreme Court decided the constitutionality of ADOC's protocol 16 years ago when it noted the parties' agreement that without sedation, a drug that "stops respiration" by "paralyzing the diaphragm" results in an "unacceptable risk of suffocation…." *Baze*, 553 U.S. at 44, 53. According to Grayson, a nitrogen-hypoxia execution without first rendering the inmate unconscious is *per se* unconstitutional, but Smith, Miller, and even the Supreme Court missed that fact. *See Smith*, 144 S. Ct. at 414 (Sotomayor, J., dissenting); *id.* at 416 (Kagan, J., dissenting); *Bucklew*, 587 U.S. at 164-95 (Breyer, J., dissenting) ("[T]he majority does not dispute the evidence suggesting that nitrogen hypoxia would be 'quick and painless' and would take effect in 20 to 30 seconds."). For several reasons, Grayson's theory is wrong.

20

*First*, "*Glossip* left no doubt that [its] standard governs 'all Eighth Amendment method-of-execution claims.'" *Bucklew*, 587 U.S. at 134. Under that standard, Grayson must prove a substantial likelihood of severe pain. A *per se* rule would relieve him of his burden. More than that, the Supreme Court has specifically rejected the idea of a "list" of methods "categorically off-limits." *Bucklew*, 587 U.S. at 136; *id.* at 137 ("The dissent insists that some forms of execution are just categorically cruel."). It would be surprising if *Baze* stood for a *per se* rule and even more so after *Bucklew*. Grayson has no legal support—not a single decision deeming a method to be unconstitutional based on a *per se* rule without any showing of pain.[5]

*Second*, Grayson misreads *Baze v. Rees*. In that case, the parties agreed that if the sedative were not properly administered, the inmate undergoing lethal injection would experience "severe pain" due to *both* the paralytic drug and the potassium chloride. 553 U.S. at 49. The only question was the likelihood that the sedative would not work as intended. The plurality found no real risk, so there was no

---

[5] Indeed, the only authority Grayson cites (other than *Baze*) is a decision of this Court denying an appeal to a habeas petitioner who "sexually assaulted and brutally strangled his neighbor Sara Radfar … chok[ing] and suffocat[ing] [her] to the point that he thought she was dead. … She regained consciousness and ran …, but [he] dragged her back and choked and suffocated her again until she was dead." *Brant v. Sec'y, Dep't of Corr.*, 2024 WL 1187330, at *1 (11th Cir. Feb. 29, 2024). That this murder was heinous, atrocious, or cruel under state law has no bearing on the judicial execution of Carey Grayson. As the district court stated in considering a similar argument, "on the ladder of whether it carries any weight or true relevance[,] I don't even know if we're taking a step up off the ground." 2 Tr. 37.

occasion to decide whether some un-sedated pain would be constitutional. In other words, the key passage on which Grayson relies (at 6) was *obiter dictum*; it had no bearing on the outcome. The assumption that administering pancurionium bromide *and* potassium chloride without a sedative would be unconstitutional did not create a binding *per se* rule against any and all methods involving "conscious suffocation."

Further, the district court rightly contrasted nitrogen hypoxia with the "conscious suffocation" at issue in *Baze*. An inmate who received the second round of Kentucky's three-drug cocktail without a sedative would be sensate while his diaphragm and lungs become paralyzed and his inability to expel carbon dioxide causes painful hypercapnia. And an inmate who received potassium chloride without a sedative would feel "burning and intense pain." 553 U.S. at 114 (Ginsburg, J., dissenting); *accord* Tr. of Oral Arg. 3 ("excruciating burning pain as it courses through the veins"); *id.* at 27. That's what the Supreme Court opined in *dicta* might be unconstitutional without a sedative; it's a far cry from the rapid and painless unconsciousness induced through ADOC's nitrogen-hypoxia protocol.

Tellingly, Grayson resorts to jarring and misleading hypotheticals like sealing a prisoner in "a dry-cleaning bag" or "submerging [his] head in a tub of water until he drowns," Blue Br. 7-8, illustrating exactly why the "mechanism of action" can make all the difference, *id.* at 4, 16. Those methods offend because one can imagine they involve intense, superadded pain. But in this case, there is no pain whatsoever.

His own expert admitted again and again that the risk he alleged was only psychological. *See, e.g.*, DE84-54:127-28, 130-31, 140, 151-52; 1 Tr. 180-81, 226-27 ("Q. … the only pain that you feel is associated with the ADOC protocol is a fear, a panic, a psychological type pain? A. Agreed."). Thus, in proper context, the district court's rationale did not license any and all forms of suffocation; it explained, rightly, that the *dicta* in *Baze* arose in its own factual context very different from the relatively painless method now under review.

*Third*, the rest of the Supreme Court's method-of-execution caselaw confirms that pains much greater than Grayson's alleged psychological stress still do not render a method unconstitutional. *Cf. Bucklew*, 587 U.S. at 132-33 (discussing Stuart Banner, The Death Penalty: An American History 170 (2002)); *Bucklew*, 587 U.S. at 154, 157-58 (Breyer, J., dissenting); *In re Kemmler*, 136 U.S. 436, 446 (1890); *Wilkerson v. Utah*, 99 U.S. 130, 134-36 (1879); *see also In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 290 (6th Cir. 2019).

*Finally*, Grayson has admitted in this very case that a method involving conscious suffocation can be constitutional. *See, e.g.*, DE1 ¶101; *accord* DE39:5. And he initially advocated a "hyperbaric chamber" alternative nitrogen protocol that did not ensure unconsciousness. *See* DE1 ¶¶78-88. After the State's motion to dismiss (DE19:25-27), Grayson abandoned that alternative because it "appeared to be nonfeasible," not because he thought it unconstitutional. 1 Tr. 15. Grayson should

23

be held to his initial litigation position in this case, not his new one that there exists a "per se prohibition on executions that cause conscious suffocation." Blue Br. 8. Not only does his *Baze* argument contradict his position in *this* case; Grayson represented to the federal courts and the State that nitrogen hypoxia was constitutional over five years ago. *See* DE95:3. He has now shamelessly admitted that his prior representation was a "stalling tactic." DE84-53:76. What more does an inmate need to do to disqualify himself from equitable relief?

At a minimum, the Court should apply judicial estoppel here to reject Grayson's first argument that nitrogen hypoxia is *per se* unconstitutional unless the inmate is already rendered unconscious by a separate method. Applying estoppel would "protect the integrity of the judicial process" by preventing Grayson from "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Estoppel may be a "useful tool for identifying inmates who are more interested in delaying their executions than in avoiding unnecessary pain." *Middlebrooks v. Parker*, 22 F.4th 621, 628 (6th Cir. 2022) (Thapar, J., statement).

### B.    The Chance of a Painless Laryngospasm Does Not Present a Substantial Risk of Severe Pain.

Grayson's argument that ADOC's protocol is very likely to cause a "constitutionally impermissible level of pain" centers on the possibility that either "anxiety" or "the high flow rate" of gas causes a laryngospasm, a contraction of the

vocal cords, which might last for "three to five minutes," Blue Br. 9, 13. A prolonged spasm, according to Grayson, could cause additional panic in the inmate and pulmonary edema, a swelling of the lungs.

Even on its own terms, Grayson's theory does not state a constitutional violation: Behind the medical jargon, there is no superadded pain because there is no pain at all. As Grayson's expert Dr. McAlary testified, a throat spasm is not painful. And anxiety, even if it causes a spasm that causes additional anxiety, is "to be expected regardless of the method of execution." DE95:46; *accord* DE30-9¶12; *accord* DE84-54:151-52 (McAlary Depo). Grayson has not alleged, let alone proven, that the protocol is uniquely distressing among methods of execution.[6] A throat spasm and attendant swelling could result from any method, including Grayson's alternatives. Dr. McAlary was asked half-a-dozen times to characterize the pain he predicted, and every time, he answered that it was an emotional, mental kind of harm, not a physical pain. *See, e.g.*, DE95:46. Grayson did not prove more,[7]

---

[6] Dr. McAlary does elliptically opine that "inhaling" amounts to "participat[ion]" in an execution, which could "increase[]" the panic. DE30-9¶12. But he is not a psychologist and provides no support. It is difficult to see why nitrogen would create greater panic where other methods pose a much greater likelihood of some physical pain. *See, e.g.*, *Baze*, 553 U.S. at 53; *Bucklew*, 587 U.S. at 132; *see also Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947).

[7] In a footnote (at 10 n.35), Grayson alludes to the "extreme pain" of "drowning," which has never been at issue here. Unlike ADOC's method, drowning prevents the exhalation of $CO_2$, resulting in severe and painful hypercapnia. Drowning may involve inhaling water into one's airways, which is also painful, unlike inert-gas

so he is unlikely to satisfy the first prong. *Cf. Bucklew*, 587 U.S. at 129-35; *In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 450 (6th Cir. 2018).

On appeal, Grayson mentions his expert only once (at 13), perhaps because the district court found Dr. McAlary's testimony to be less "credible and persuasive" than that of the State's expert, Dr. Antognini. DE95:51. A big part of the problem was that Dr. McAlary offered no "real foundational support" and "no case studies or articles"—just his "unsupported opinion." DE95:37. And Dr. McAlary crucially relied on "highly questionable hearsay witness accounts." *See* DE95:51; DE84-54:146 ("[U]nless the media observers are wrong…"). Combining the newspaper stories with the autopsy finding of pulmonary edema, Dr. McAlary jumped to the conclusion that Smith had negative pressure pulmonary edema (NPPE), caused by an upper airway constriction, which would have involved "emotional pain." 1 Tr. at 184, 201-02. Given this poor evidentiary foundation and the "speculative parade of highly unlikely events" that would have to occur for Grayson's fear to materialize, the district court did not plainly err in finding that Grayson failed to show a protocol "sure or very likely to cause serious illness and needless suffering." DR95:44, 52.

---

asphyxiation. *See also Lee*, 591 U.S. at 981 (vacating stay because allegation that flash pulmonary edema would be felt by inmate was contested).

### 1.    Grayson has not shown high odds of a laryngospasm caused by panic or gas resulting in NPPE and mental distress.

**Panic-Induced Laryngospasm.** The alleged risk is not likely to occur, and the district court rightly found it to rely upon a parade of speculation. For the fear to materialize, (1) Grayson would need to experience a unique state of extreme panic, beyond that which his prescribed anti-anxiety medication could alleviate; (2) due to the panic, his laryngeal muscles would need to contract exactly when the nitrogen begins flowing but before he loses consciousness; (3) his airway would need to close completely or significantly enough to impact his breathing, causing forced inspiratory efforts that create enough pressure against the airway to draw blood and fluid into the lungs; and (4) all this would need to be perceived by Grayson prior to unconsciousness and long enough for him to experience an unconstitutional level of psychological harm. Blue Br. 13. Not one of these steps is likely, and the conjunction of them even less so; the district court's findings were not clearly erroneous.

The scenario is unsupported by research. As the district court emphasized, Grayson brought no case reports, studies, or journal articles discussing panic-induced laryngospasms or panic-induced NPPE. Dr. McAlary was not aware of any such publications. While he cited personal experience seeing laryngospasms when a *foreign object* like a breathing tube is inserted or removed, 1 Tr. 188; 2 Tr. 22-23, Dr. McAlary has not witnessed nor read about *anyone* experiencing laryngospasms, let alone NPPE, due purely to panic. It seems the only person ever to experience this

phenomenon, according to Grayson and his expert, is Kenneth Smith. (No one until Dr. McAlary and no one other than Dr. McAlary has diagnosed Smith with NPPE.) The convenience of this hypothesis is enough to discredit it. An expert can "draw conclusions from existing data," but Dr. McAlary "drew conclusions where there was no existing data." *McDowell v. Brown*, 392 F.3d 1283, 1301 (11th Cir. 2004).

Why did Dr. McAlary fail to offer any examples of panic-induced airway constriction? Because what often happens during a panic or anxiety attack is the exact opposite—*hyperventilation*. 2 Tr. 62. As Dr. Antognini explained, hyperventilation typically makes the airway "even more open" than normal. *Id.* at 63. Dr. McAlary's theory relies on speculation that a panicking inmate's airway will not only close but close so much as to produce forceful breathing against negative pressure, drawing fluid and blood into the lungs. There's no basis for that hypothesis.

Additionally, Dr. McAlary noted that the risk cannot be predicted with any degree of certainty because the chance of "a panic-induced closure of the upper airway" "depend[s] entirely on the patient." 1 Tr. 184. That dooms Grayson's facial challenge, which requires him to show some likely risk inherent to the method.

**Gas-Induced Laryngospasm.** Another way Grayson could suffer a throat spasm, he says, is that if his "mouth is open" and the "air hits back there" at a high rate of flow. 2 Tr. 205. This too does not meet the probability threshold for an Eighth Amendment risk. First and foremost, this has never happened to anyone wearing

ADOC's mask at the execution flow rate. Grayson ignores the testimony of James Houts who has worn the mask at that flow rate for a total of *three to five hours* and experienced no throat spasms. 1 Tr. 165. Mr. Houts reported that many others have worn ADOC's mask with air flowing at the execution flow rate, and he has never heard of anyone having a bronchospasm or laryngospasm. *Id.* at 165-66.

Second, the mask manufacturer *instructs* users to set a flow rate similar to that called for in the protocol. *Id.* at 225. Despite the mask's wide use in "industrial settings," *id.* at 184-85, 225, neither Grayson nor Dr. McAlary found any reports of throat spasms with its use (or with any other supplied-air respirator, for that matter). *Id.* at 225-26. Unlike Dr. McAlary, Dr. Antognini actually researched the alleged risk, but he did not find any relevant cases. 2 Tr. 67. As Dr. Antognini put it, "if these flow rates caused laryngospasm or some type of bronchospasm in just your everyday working person, they would never be used"; either it "doesn't happen," or it's "very, very rare." *Id.*

Again, Dr. McAlary was qualified his opinion, stating that the likelihood of a spasm from the rate of gas flow is "very person specific." 1 Tr. 185. It "*could*" happen, he said, if somehow the "high flow rate hit[] the vocal cords." *Id.* Another naked assertion from Dr. McAlary, who could not assign a probability to the risk. DE95:10; 1 Tr. 224. Confronted with the reality that many people have worn the

mask at the execution flow rate and experience no discomfort (let alone spasms or NPPE), Dr. McAlary responded: "Wouldn't surprise me at all." *Id.* at 226.

Aside from speculation, Grayson has no evidence for his conclusion that the flow of nitrogen gas is sure or very likely to induce an upper airway constriction.

### 2. Grayson has not shown that the alleged risk is severe.

Grayson also failed to show any risk of "severe pain," "sufficiently imminent dangers" of "serious illness and needless suffering." *Baze*, 553 U.S. 49-50. Grayson's opening brief omits that Dr. McAlary clearly and repeatedly identified a prospect of *only* psychological distress—in essence, the inmate's fear of death.[8] As the district court put it, "Dr. McAlary acknowledged during the preliminary injunction hearing that *there is no risk of physical pain* associated with the nitrogen hypoxia protocol, only psychological" harm that "would exist regardless of the method of execution." DE95:35 n.16, 45 (emphasis added). But the risk that an inmate experiences fear or even panic cannot make the method unconstitutional, for it may be "an inescapable consequence" of his punishment. *Baze*, 553 U.S. at 50. This risk was not superadded.

_____

[8] In Dr. McAlary's report, he wrote that "there is an almost certain risk of agony due to conscious deprivation of oxygen." DE30-9¶5. When asked whether one could substitute "death" for "conscious deprivation of oxygen," Dr. McAlary agreed that would be a fair characterization of his opinion. DE84-54:152.

States are not constitutionally required to take extra steps to alleviate a prisoner's mental distress. In any event, ADOC's method will render an inmate unconscious—if he breathes the gas, "within 10 to 40 seconds" and at most, "within minutes." DE95:12, 48. On Grayson's theory, the rapid unconsciousness produced by nitrogen hypoxia isn't good enough; States must use a drug to render a prisoner unconscious first. That's not the law, and there is no authority to support it. The Supreme Court has sustained every method against challenge regardless of any specific provision for a condemned's potential anxiety.

Grayson cannot show severity with such a subjective harm. Psychological reactions to an upper airway constriction can range "from minimal to panic," according to Grayson's expert, 2 Tr. 26, and there is no way to predict, on this record, that Grayson or any other inmate would experience more than "minimal" discomfort. But even if Grayson could show a likelihood of panic, *e.g.*, 1 Tr. 187, during an otherwise painless method, that risk would not put the method in the same category as the "inhuman and barbarous" and "horrid modes of torture" the Amendment was designed to prohibit. *Bucklew*, 587 U.S. at 130-31, 134; *cf. Lee*, 591 U.S. at 980.

Grayson cites Dr. Antognini's opinion that reaching a hypoxic death "slowly" could be painful (at 10) and that, with midazolam, any "obstructed breathing would not be painful" (at 12), but Dr. Antognini testified that Alabama's process causes *rapid* unconsciousness (measured in seconds, not minutes), and he concluded that

an inmate "will not have a physical pain," 2 Tr. 55; DE95:12; *contra* Blue Br. 12-13. There was no testimony that the nitrogen-hypoxia method would produce a painful, obstructed airway. And inert gases have caused so many accidental deaths precisely because the sensation of suffocation rarely manifests; if it did, many victims would have self-rescued. *See, e.g.*, 2 Tr. 214:7-15.

The State and its expert Dr. Antognini cited "numerous" case reports, federal government documents, journal articles, and studies to support the view that inert-gas asphyxiation using a supplied-air respirator will produce rapid unconsciousness without pain. DE95:6, 45-46. In light of the whole record and the determination that Dr. Antognini was the more credible expert, the court's finding that Grayson has not shown a substantial risk of severe pain was not clearly erroneous.[9]

### 3. The executions of Kenneth Smith and Alan Miller were not cruel, and neither man experienced a laryngospasm.

Grayson's claim fails on its own terms to state a constitutional violation, but the Court may reach the same result by affirming the district court's fact findings

---

[9] On appeal, Grayson seems to abandon the hodgepodge of other risks he alleged in his complaint, which the district court also deemed to be highly speculative. For example, Grayson claimed that ADOC must conduct a medical examination of inmates to check for airway obstructions like sleep apnea—a condition he does not have. Grayson claimed that ADOC would not properly fit the mask to his face, but "little evidence was presented of this unsubstantiated assertion." DE95:47. Grayson complained that the execution team used two pulse oximeters and two EKGs: Both could fail simultaneously, and ADOC employees might be unqualified to read the numbers on these devices, Grayson said. The district court did not err when it rejected these frivolous allegations. *E.g.*, DE95:49.

about Smith and Miller executions. On appeal, Grayson says that witnesses saw "movement and breathing issues," and *if* hypoxia were developing "slowly," then there "could" have been some unspecified "suffering." Blue Br. 10. Lacking studies, case reports, or any research to support his theory, Grayson resorts to a strained view of events based almost exclusively on defective media reports and the Smith autopsy. But the district court was right: for a variety of reasons, the media reports were "highly questionable," and the autopsy report provides "no support" for Grayson's theory, DE95:51.

Although the execution team captain was "not exactly sure" how long Smith remained conscious, 1 Tr. 145; *id.* at 155, the duration hardly matters because Smith was holding his breath. We know that because of Smith's pulse oximetry, *id.* at 149-50, the observations of Ms. Cynthia Stewart-Riley, *id.* at 103-04, the testimony of Dr. Antognini, 2 Tr. at 59-60, a statement from Smith's own expert, *id.*, and Smith's behavior—"resisting" and claiming he could "smell[]" the nitrogen—even before the gas began to flow. 1 Tr. 58, 103-04; *see also* Statement §II.[10]

True, Smith's autopsy showed pulmonary edema and blood in Smith's lungs, 1 Tr. at 173-74, and Dr. McAlary was "taken aback" by those findings, 1 Tr. at 174. But Dr. McAlary had never worked on a judicial execution, *id.* at 198, never treated

---

[10] Any notion that an inmate's breath-holding could support a constitutional violation is waived, and Grayson does not plan to hold his breath, DE53:18.

33

a patient exposed to inert gas, *id.* at 222, and did not perform *any* independent research to corroborate his reaction, *see, e.g.*, *id.* at 202, 206; *see also* DE84-54:86-87. The autopsy findings are meaningful only in comparison to some expectation or norm, but aside from cerebral edema and cyanosis, Dr. McAlary *did not know what to expect* from a case of hypoxic death. DE84-54:91.

To the medical examiner who performed the autopsy, however, the findings were unsurprising. She not only disputed Dr. McAlary's view but also explained that pulmonary edema and blood in the lungs are "expected in cases of asphyxia or hypoxia." 1 Tr. at 243; *accord* 2 Tr. at 61 (Dr. Antognini explaining that pulmonary edema is a "very common" autopsy finding). Indeed, there are "several potential causes" for Smith's pulmonary edema. *Id.* at 126-27. In sharp contrast with Dr. McAlary, Dr Antognini cited a plethora of articles and cases involving pulmonary edema, which in any event would "occur after the person is unconscious." *Id.*

Dr. McAlary's "differential diagnosis" relied on media reports. *See, e.g.*, DE84-54:146 ("[U]nless the media observers are wrong..."). Some journalists wrote that Smith made seizure-like movements and gasping breaths. But movements, even convulsions, are not surprising with inert-gas asphyxiation: the experts agreed that unconscious, hypoxic people may move, 1 Tr. 227-28; 2 Tr. 66, and Dr. Antognini was "not surprised" by reports about Smith. 2 Tr. 66. Several exhibits describe how gas exposure can cause convulsions or other involuntary movements *after*

34

unconsciousness. DE84-33, 34, 37, 42. If the movements meant suffering, then Grayson must (and does not) explain why inert-gas asphyxiation has been adopted as a painless method of suicide and has caused many workplace fatalities that likely could have been avoided had there been physical signs that something was wrong. *See, e.g.*, DE84-42, DE58 at 11-12.

To someone without a "medical background," the mistake is understandable. 2 Tr. 65; 1 Tr. 183. An unconscious inmate's "convulsions or seizures could be misperceived as signs of consciousness or distress." *Baze*, 553 U.S. at 57. And Grayson *agrees* (at 10-11) that "a lay person without medical training" may confuse "agonal breathing [for] consciously gasping for air." Lethal-injection protocols often employ a paralytic agent that "prevents involuntary physical movements." *Baze*, 553 U.S. at 57.[11] ADOC's nitrogen hypoxia protocol does not do so, which explains why a witness who has seen lethal injection might be surprised by some aspects of nitrogen hypoxia. *Compare* 1 Tr. 183 (Dr. McAlary) ("fish gasping … would be a reasonably good example of agonal breathing"), *with* DE42¶¶31-32, 46 (N.Y. Times) (describing Smith as "a fish out of water" compared to an inmate "going to sleep" after lethal injection).

---

[11] Anesthesiologists use the same paralytic drug for surgery because unconscious patients can move and interfere with certain medical procedures. 1 Tr. 228.

Another reason to view the media reports with caution is that witnesses had no way to know when the nitrogen gas began to flow nor when Smith began to breathe it. They had no idea if Smith began moving on the gurney prior to the nitrogen gas flowing, prior to breathing nitrogen gas, after breathing nitrogen gas, or after he became unconscious. Based on what journalists knew at the time, it was impossible for them to draw any reliable conclusion about what caused Smith's movements; so too for Dr. McAlary who relied on their reporting. Smith began moving before his oxygen levels dropped, suggesting that his moving had nothing to do with nitrogen gas. *See supra*, Statement §II.

Dr. McAlary put a premium on hearsay and thus interpreted Smith's movements as signs of distress. That colored his explanation for the autopsy findings and led him to conclude that Smith experienced NPPE. He reasoned backward that NPPE meant Smith experienced an upper airway constriction, although he was "unaware" of any study or "case report" documenting NPPE from anxiety or panic. 2 Tr. 8-9. The medical examiner who performed the autopsy (which Dr. McAlary called "very well done," 1 Tr. 175) did not believe that Smith had NPPE, 1 Tr. at 245, and Dr. Antognini was perplexed by Dr. McAlary's diagnosis and his opinion that NPPE cannot occur in an unconscious individual, 2 Tr. at 59, 61-62.

The Miller execution should quell all doubt, and Grayson has nothing to say about it. The execution team captain testified that Miller's blood-oxygen levels

36

plummeted within the first minute or so, and Miller "appeared deceased" after just six minutes. 1 Tr. 150-51. Ass't A.G. Rich Anderson testified that Miller "relaxed and … became still" about two minutes after the signal for nitrogen to begin flowing. 2 Tr. 146. The district court summarized:

> The evidence at the hearing showed that Kenneth Smith and Alan Miller became unconscious within minutes after the nitrogen gas started flowing, experienced agonal breathing after their loss of consciousness, and that Smith held his breath and struggled against the restraints while Miller did not.

DE95:48. The entire basis for Grayson's Eighth Amendment claim—media speculation about the Kenneth Smith execution and a misreading of the autopsy report—is unsupported and in fact contradicted by the rest of the record.

## C.    Grayson Failed to Show a Feasible and Readily Available Alternative That Would Significantly Reduce the Alleged Risks.

Grayson's claim requires proof of another "feasible and readily available method … that would have significantly reduced a substantial risk of pain." *Bucklew*, 587 U.S. at 138. The alternative also must be a "known" method, *Glossip*, 576 U.S. at 878, "sufficiently detailed," *Nance*, 597 U.S. at 169, with "documented advantages," *Baze*, 553 U.S. at 52. Its "comparative efficacy" must be "so well established" that refusal to adopt it implies cruelty. *Id.* at 57. If Grayson offers a qualifying alternative, the State may nonetheless have a "legitimate penological justification" to stick with its method. *Id.* at 52.

Grayson proposes two novel and experimental alternatives. The first modifies ADOC's protocol by dramatically reducing the flow of gas (to 5 liters per minute) and requiring two different sedatives: midazolam and ketamine. DE42¶¶84-86, 89. On this proposal, the inmate would either drink a large dose of midazolam,[12] or refuse, in which case ADOC would administer midazolam via intramuscular (not intravenous) injection. *Id.* ¶84 & n.19. ADOC would then administer an intramuscular injection of ketamine, wait until the inmate appears to be unconscious, and then commence nitrogen gas. *Id.* ¶¶86-89. Then, if an inmate remains conscious thirty minutes after taking midazolam and after two ketamine injections, the execution is called off. *Id.* ¶¶87-89. Grayson's second alternative—hardly mentioned and arguably waived in the opening brief—is a new lethal-injection protocol, proposing intramuscular injections of both ketamine and fentanyl. *Id.* ¶91.

Neither alternative proposal came with much evidence, and the district court correctly rejected them as "untested" methods with "their own set of risks and complications." DE95:51.

---

[12] According to Grayson's first amended complaint, the dosage of midazolam should be 10 mg/kg. According to his second amendment, which the district court granted at the evidentiary hearing, the dosage should be 0.2 mg/kg.

### 1. Grayson's alternative nitrogen protocol fails the feasibility and risk-reduction requirements.

**a. Feasibility.** Grayson's nitrogen hypoxia alternative is not feasible and readily available for three reasons. *First*, Grayson still hasn't produced evidence that the State has a viable means of obtaining the drugs for his alternatives. *See* DE95:49. Grayson must show that his alternatives are available *to Alabama*, not other States. *See Brooks v. Warden*, 810 F.3d 812, 819 (11th Cir. 2016); *contra* Blue Br. 15-16. And he must show they are available for executions—not just to *patients* who have a medical need and a prescription. 810 F.3d at 820. A doctor cannot write a prescription for no medical reason. And based on the testimony and evidence about medical organizations' codes of ethics, 1 Tr. 199-200, the State can fairly doubt that *any* doctor would prescribe drugs as part of an execution protocol. If Grayson believes that certain sedatives are medically necessary, then, as the district court noted (at 46), he could try to acquire a prescription "for therapeutic purposes"; if they are not medically necessary, then Alabama's care provider would not provide them for use during an execution, and their availability remains uncertain. Either way, Grayson has not met his burden.

Put another way, the alternatives would seem to require that a physician with ADOC's care provider, exercising independent judgment, would agree precisely with Grayson's views on the *medical necessity* of midazolam and ketamine. That is

very speculative. All the more so given that Dr. McAlary did not diagnose or examine Grayson and has not prescribed him any sedative. 2 Tr. 20-21.

States also have strong penological reasons to reject methods using controlled substances. "[T]he question of capital punishment belongs to the people and their representatives," *Bucklew*, 587 U.S. at 150, and the People are entitled to protect that power from forces beyond their control, such as drug manufacturers refusing to provide their products, *see, e.g., Glossip*, 576 U.S. at 869-71, pharmacies facing "threats, harassment, and boycotts," *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1332-33 (11th Cir. 2020), and "ethics rules or traditions" may "impede" the participation of medical professionals, *Baze*, 553 U.S. at 66 (Alito, J., concurring); *see also Bucklew*, 587 U.S. at 134-35. By adopting a method that does not depend so heavily on external variables, Alabama has ensured that questions over the propriety of capital punishment will remain entrusted to the People.

*Second*, Alabama has penological reason to reject a method involving the oral ingestion of drugs. Grayson does not wish to swallow a midazolam syrup. He does not explain how the State could make him do so, and Dr. McAlary testified that even children can successfully resist oral drugs. DE84-54:59; *see* DE95:49.

Oral administration of midazolam also increases the time of sedation, 2 Tr. 27, which makes it a poor fit for Grayson's protocol with strict time limits to obtain unconsciousness before *calling off* an execution (despite administering a potentially

40

lethal dose of midazolam). 2 Tr. at 27; DE42¶¶84-89. While the State has experience with intravenous midazolam, the FDA-approved insert notes that the "safety and efficacy of midazolam following *non-intravenous and nonintramuscular* routes of administration have not been established." DE84-27:17 (emphasis added); *see id.* at 33 ("Midazolam injection should only be administered IM or IV").[13]

*Third*, Grayson's alternative to his alternative—which applies if "the prisoner refuses[] or is unable[] to ingest midazolam orally," DE42:12 n.19—is an intramuscular injection. According to Dr. McAlary, that is "not the best route." 1 Tr. 192. It is important for absorption that the injection hit muscle, not fat, 2 Tr. 13, and someone "well trained" may still "have problems getting into the muscle," *id.* at 71. The State cannot rely upon "well trained" doctors to participate, so there is a valid penological reason to avoid a method prone to this kind of error, especially in conjunction with the proposed time limits. (The same reason applies to the fentanyl alternative too.)

Grayson's answer for who could do an intramuscular injection is the IV team. But with lethal injections, the IV team's role is limited to setting the IV. Its members do *not* push the lethal drugs, which they or others may fairly view as participation in the execution. State law authorizes only the Warden or designated prison employees to "administer the lethal injection." *See* Ala. Code §15-18-82(c).

---

[13] Grayson did not admit into evidence an FDA-approved insert for oral midazolam.

**b. Risk Reduction.** Grayson also failed to meet his burden to show that his nitrogen hypoxia alternative will substantially reduce pain.

First, the alleged risk from an upper airway constriction arises not from any pain or discomfort associated with the protocol, but the inmate's mind. The State cannot control that risk with any alternative. On Grayson's proposal, he would be made unconscious with drugs, but he could just as easily panic—and suffer spasms or NPPE—before taking the drugs or before they take effect.

Second, Grayson would have the Court force Alabama to "experiment" with these new alternatives, which "no other State ha[s] adopted" and for which he has "proffered no study showing" they would be as "effective and humane as the State's existing" methods. *Bucklew*, 587 U.S. at 142. Novel alternatives like these fail as a matter of law. *See infra* §I.C.3.

Third, ketamine and midazolam have their own side effects, some of which pose the very risks Grayson seeks to minimize. Especially at Grayson's requested dosages, the upside is very speculative.

*Ketamine.* Both of Grayson's alternatives call for the use of ketamine. The FDA label for KETALAR (a brand name for an injected ketamine anesthetic) cites among the known adverse reactions "[l]aryngospasms and other forms of airway obstruction." DE84-26:7. Ketamine can also cause respiratory depression "in which case supportive ventilation should be employed" and as a precaution, the drug should

be "used under the direction of physicians experienced in administering general anesthetics and in maintenance of an airway and in the control of respiration." *Id.* at 3, 4. The label warns that rapid administration of ketamine risks apnea or respiratory depression. *Id*. at 4. Ketamine can be "clinically compatible with the commonly used general and local anesthetic agents," but only "when an adequate respiratory exchange is maintained." *Id*. at 6. Not only might ketamine exacerbate any risk of airway constriction; "anxiety" and "psychotic episodes" are also among the reported symptoms. *Id*. at 7. It is too speculative to predict ketamine will significantly reduce the alleged risks when ketamine poses the very same risks.

*Midazolam.* Grayson suggests oral (or intramuscular) midazolam as a sedative, combined with ketamine. As reflected in the FDA-approved midazolam insert, intravenous midazolam "has been associated with respiratory depression and respiratory arrest, especially when used for sedation in noncritical care settings." DE84-27:1. Midazolam requires individualized dosing "when used with other medications capable of producing central nervous system depression." *Id.* at 14-15. "Serious cardiorespiratory adverse events have occurred …. These have included respiratory depression, airway obstruction, oxygen desaturation, apnea, respiratory arrest and/or cardiac arrest, sometimes resulting in death or permanent neurologic injury." *Id*. at 15. In bolded capital letters, the FDA-approved label warns:

**BECAUSE    SERIOUS    AND    LIFE    THREATENING
CARDIORESPIRATORY ADVERSE EVENTS HAVE BEEN**

**REPORTED, PROVISION FOR MONITORING, DETECTION AND CORRECTION OF THESE REACTIONS MUST BE MADE FOR EVERY PATIENT TO WHOM MIDAZOLAM INJECTION IS ADMINISTERED, REGARDLESS OF AGE OR HEALTH STATUS.**

*Id*. at 32. While Grayson has argued that the State has experience with midazolam, he must show how the alternative will reduce the same risks he has pleaded, such as distressing throat spasms. It is far from clear that midazolam, posing its own respiratory risks, would reduce that risk overall. And the State certainly does not have experience combining midazolam, ketamine, and nitrogen gas.

Further, the majority of adverse events associated with oxygenation and ventilation of patients have been reported when midazolam is administered with other drugs capable of depressing the central nervous system, and the risk is higher "in patients undergoing procedures involving the airway without the protective effect of an endotracheal tube." *Id*. at 27. Midazolam may well be medically contraindicated if combined with ketamine and the inhalation of inert gas. Particularly if Dr. McAlary were correct that the execution flow rate is too high (something Defendants dispute), the alleged sensitivity of a person's airway in those conditions would seem to make midazolam inappropriate, according to the label.

The "usual adult dose" for intramuscular midazolam is 0.07 to 0.08 mg/kg. *Id*. at 35. Grayson's most recent suggestion is a weight dosage of 0.2 mg/kg—more than twice the recommendation. Considering the warnings about airway maintenance and

44

respiratory depression, especially in cases of overdosing, ADOC has a penological reason to reject the alternative. Again, Grayson cannot allege that ADOC's protocol risks airway obstruction while proposing to address the risk by a large dose of medication that could recreate the very same risks.

*Significantly Lower Nitrogen Flow Rate.* Grayson's nitrogen alternative also increases the risks by calling for nitrogen gas to flow at 5 liters per minute, which is very low. Ass't A.G. James Houts wore the mask at that flow rate and testified that "you might as well not have the air turned on." 1 Tr. 166-67. According to Dr. Antognini, such low rates would "increase the [alleged] risk of negative-pressure pulmonary edema, … prolong the nitrogen buildup, and … cause a suffocation feeling." 2 Tr. 70. Although there is no negative pressure applied in either ADOC's nitrogen protocol or Grayson's alternative, the latter is the only one that might feel like having a "plastic bag over the face," *id.* at 203.

### 2.    Grayson's fentanyl proposal should be barred, and it fails the risk-reduction and feasibility requirements.

Below, Grayson "focus[ed]" on his nitrogen-hypoxia alternative over his ketamine-plus-fentanyl alternative. DE95:50 n.27. Thus, he has "very little evidence" to support it. *Id.* The trend continues on appeal, and Grayson references fentanyl just one time. He makes no claims about how effective it is as a method of execution, he doesn't grapple with the potential side effects, and he makes no effort to explain why it is more humane. Instead, his single reference to fentanyl is a brief

45

claim that *other States* have access to it. Grayson sued the State to obtain nitrogen hypoxia as method, so the Court shouldn't even entertain this alternative.

**a. Risk Reduction.** Compared to nitrogen hypoxia, execution by fentanyl would not significantly reduce a substantial risk of severe pain. Like his other alternative, Grayson's ketamine-fentanyl alternative comes with its own risks. *see, e.g.*, *supra* 43-44 (ketamine); DE95:50 (fentanyl). Those side effects include, for example, respiratory depression, vomiting, anaphylaxis, and *laryngospasm*. DE95:50. The evidence suggests that a laryngospasm is highly unlikely under the current protocol, but what about under Grayson's protocol? The record is unclear because Grayson ignores the risks and makes little attempt to show the complete picture of an overdose death by ketamine and fentanyl. He has not shown this alternative to be less painful, more "humane," or even as "effective" when compared to ADOC's protocol. *Bucklew*, 587 U.S. at 142.

**b. Feasibility.** The ketamine-plus-fentanyl alternative is not feasible either. Grayson has not shown how the State will obtain these drugs, nor who will administer the drugs through an intramuscular injection. *See supra* §I.C.1.a.

**c. Estoppel.** Judicial estoppel bars Grayson's new lethal-injection alternative because he demanded relief *from lethal injection* on the promise that he preferred nitrogen hypoxia and that it was constitutional, feasible, and readily available. Doc. 348 at ¶163, *In re: Ala. Lethal Injection Protocol*, No. 2:12-cv-00316 (M.D. Ala.

Nov. 29, 2017). This Court ought not "for a moment countenance" his contradictory stance, which is designed "to forestall [his] execution." *Nance*, 597 U.S. at 174. If Grayson had genuine concerns, he should have pleaded them in his prior §1983 case to give the State a "pathway forward." *Id.* at 169. Here is an inmate admittedly "more interested in delaying [his] execution[] than in avoiding unnecessary pain." *Middlebrooks*, 22 F.4th at 628.

### 3. Late-breaking and experimental methods fail as a matter of law.

For each of his proposals, Grayson can succeed only if he shows the State lacks "a legitimate penological reason" for refusing them—in other words, if the State chooses pain for the sake of pain. *Bucklew*, 139 S. Ct. at 1125. In addition to the evidence discussed above, the State has penological reasons to seek "more humane methods," *Glossip*, 576 U.S. at 892, and methods that "preserv[e] the dignity of the procedure," *Baze*, 553 U.S. at 57. For Grayson, it is "hard to show" Alabama lacks "a legitimate penological reason" to reject his novel alternatives when he offered them "only a few weeks ago." DE95:49 n.25. His alternatives were a "moving target," *id.* at 5 n.2, and Grayson offered no "track record" for those methods, so the district court found the State had a valid reason not to adopt them, *id.* at 51.

States are not constitutionally required to "experiment" with methods of execution. *Bucklew*, 587 U.S. at 142. Absent a record of successful use or medical

evidence, the State's refusal to adopt a new method cannot be subjectively blameworthy. *Baze*, 553 U.S. at 52. Grayson still has not shown that either of his methods has been used or even studied as a means of causing death. Nor is the State aware of any studies of the efficacy of Grayson's drugs used together in the dosages and with the timeframes he proposes. The range of possible complications is a total mystery. *See* DE95:50 ("Grayson also provides no real analysis or consideration of the possible risks and side effects associated with using these sedatives in this matter."); *id.* at 51. Rather than methods with a "comparative efficacy … so well established" that refusal suggests cruelty, *Baze*, 553 U.S. at 57, Grayson put forward "untested" methods supported by the testimony of a single expert, DE95:51; *cf. Baze*, 553 U.S. at 67 (Alito, J., concurring). That expert admits that he did basically *no research*, DE84-54:17-18, yet proposes a novel protocol for every single inmate who has elected nitrogen, compared to ADOC's protocol which "has been successfully used twice, and both times it resulted in a death within a matter of minutes," DE95:52.

The State has valid reason to ask for more than the hasty back-of-the-envelope sketch of one doctor with no experience in this setting. The Court should require more too, for Grayson's claim—if successful—is a recipe for interminable method-of-execution litigation. If all it takes to stay an execution is a never-before-seen alternative supported by one expert's *ipse dixit*, federal courts will hear §1983

method suits for every execution and every method. That undermines federalism and the public's moral judgment. It is no "pathway forward." *Nance*, 597 U.S. at 169.

### D.    Grayson's Claim Will Fail Because He Conceded That Nitrogen Hypoxia Is More Humane Than Lawful Alternatives and Not Designed to Superadd Pain.

Grayson made two dispositive concessions at the evidentiary hearing on his motion in the court below. ***First***, Grayson definitively stated that nitrogen hypoxia was more humane than electrocution, 2 Tr. 175, and seemed to affirm that it was more humane than lethal injection as well, 2 Tr. 174. *See* DE95:44 n.19. Because both of those methods are constitutional and Grayson waived any argument that nitrogen hypoxia is less humane, he cannot show unconstitutional cruelty as a matter of law. Cruelty means superadded pain, and the State does not superadd pain where its method is *admittedly less painful than the constitutionally permitted level of pain*.

***Second***, Grayson repeatedly answered "No" when asked whether he had any allegation or evidence that the nitrogen-hypoxia protocol was "deliberately designed to inflict pain." 2 Tr. 173. That's also dispositive because the ultimate Eighth Amendment question—even if Grayson can satisfy *Glossip*—is whether the State's method was "*designed* to superadd terror, pain, or disgrace," *Grants Pass v. Johnson*, 603 U.S. ____ (2024) (emphasis added).[14] Grayson must prove a risk that

---

[14] *Grants Pass* was not a method-of-execution case, but it is offered to illustrate the Supreme Court's consistent articulation of the constitutional standard.

would "prevent[] prison officials from pleading that they were 'subjectively blameless[.]'" *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 50). But Grayson gave up the conclusion he was supposed to prove when he admitted that the protocol was not "written or adopted with the express point of causing pain," 2 Tr. 173. That's another way of saying the State *is* blameless and its method is not cruel, for it did not add pain "without … reason," *Bucklew*, 587 U.S. at 134.[15]

On this point, the district court left open whether Grayson had to show the method was "*designed* to superadd pain" because such "consideration has not been formally embraced … in this Circuit." DE95:27 n.11. If Grayson can satisfy the *Glossip* test, or in the alternative, this Court should formally embrace the principle that a method is not cruel if it is not deliberately designed to superadd pain.

## II.   Grayson Has Not Requested Equitable Relief, But If He Does, the Equities Favor the State.

Grayson has not asked the Court for a stay of execution, stay pending appeal, or preliminary injunctive relief. He asks to "reverse and remand" and "if necessary, issue a stay to permit the District Court time to reconsider." Blue Br. 5. In his motion to expedite briefing, Grayson also stated he was "not filing a motion for stay or preliminary injunction on appeal but reserves the right to do so." Doc. 3 at 1 n.1. The

---

[15] Grayson later tried to amend his concession—arguing "now that we've seen it in practice, we know … it does super add pain." 2 Tr. 203. That's still not enough: Grayson must show that *ADOC officials* both know the risks he alleges and deliberately chose to inflict them for no reason.

opening brief should not be construed as a motion for extraordinary equitable relief, which would require Grayson prove irreparable harm and that the equities lie in his favor. He has not attempted to make that showing; he doesn't even go through the motions. So both the alternative suggestion of a stay "if necessary" (at 5) and the suggestion to "remand the case for entry of an injunction" (at 17) should be rejected. Even if Grayson has not waived a request for equitable relief, the district court never considered the remaining equitable factors, so there is no basis on which the Court can find them satisfied.

Nonetheless, if Grayson moves for a stay or the Court otherwise considers equitable relief, the State offers the following. *First*, Grayson is admittedly guilty of an abominable crime, and his punishment is the fulfillment of the public's "moral judgment." *Calderon v. Thompson,* 523 U.S. 538, 556 (1998). An unpunished murder is an intrinsic harm to the victims, the public, and the rule of law. Further delay is tantamount to "a commutation of [Grayson's] death sentence." *Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983); *Bucklew*, 587 U.S. at 149-50.

*Second*, Grayson delayed seeking relief until August 20, 2024—about a year after the protocol was announced, eight months after the Smith execution, and more than two months after the State sought an execution warrant. *Cf. Mills v. Hamm*, 102 F.4th 1245, 1251 (11th Cir. 2024); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). In the proceedings below, Grayson engaged in a "consistent

pattern of unnecessary delay," DE68:6, including by twice amending his proposed alternatives out of time and by filing frivolous motions—such as one to disqualify the entire Attorney General's Office from representing Appellee (DE38) and one to videotape the execution of another inmate (DE50). *See generally Ramirez v. Collier*, 595 U.S. 411, 434 (2022); *Bucklew* 587 U.S. at 150; *Nelson v. Campbell*, 541 U.S. 637, 649 (2004); *Gomez v. U.S. Dist. Court for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992); *Woods v. Comm'r*, 951 F.3d 1288, 1293 (11th Cir. 2020).

***Third***, Grayson has unclean hands. He admitted to manipulating the courts once by advancing nitrogen hypoxia not as a proposal to reduce pain but as a "stalling tactic" that would cost the State "as much money" as possible. DE84-53:76, 77. And his litigation position continues to include an alternative method that Carey Grayson does not endorse. *Id.* at 44 ("I do not want midazolam."); *id.* at 64 ("This does not sound like my case."). Grayson later argued that he was under the influence of illegal drugs at the time of his deposition, 1 Tr. 11-12.

## CONCLUSION

Because the district court is correct that Grayson "fell well short" of the Eighth Amendment standard, DE95:44, the Court should affirm.

Respectfully Submitted,


Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr.
  *Solicitor General*

***s/ Robert M. Overing***
Robert M. Overing.
  *Deputy Solicitor General*

Dylan Mauldin
  *Ass't Solicitor General*

Beth Hughes
Polly Kenny
Henry Johnson
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Appellees*


November 13, 2024

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i). This brief contains 12,958 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.    In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

_**s/ Robert M. Overing**_
Robert M. Overing.
_Counsel for Appellees_

Dated: November 13, 2024

## CERTIFICATE OF SERVICE

I certify that on November 13, 2024, I electronically filed this document using

the Court's CM/ECF system, which will serve the following:

John Palombi
John_Palombi@fd.org

Spencer J. Hahn
Spencer_Hahn@fd.org

Eric Brown
Eric_Brown@fd.org

Matt Schulz
Matt_Schulz@fd.org

Kacey L. Keeton
Kacey_Keeton@fd.org

*s/ Robert M. Overing*
Robert M. Overing.
*Counsel for Appellees*